# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VELMA COOKSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-7180 |
| | ) | |
| BOARD OF EDUCATION of the | ) | Judge Joan H. Lefkow |
| CITY OF CHICAGO | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Velma Cooksey filed a two-count complaint against the Board of Education of the City of Chicago ("CPS") alleging age discrimination and retaliation while employed as principal of Wadsworth School ("Wadsworth"), in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. §§ 621 *et seq.* CPS has moved for summary judgment.[1] For the following reasons, CPS's motion is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record to view the facts

---

[1] The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper in this district under 28 U.S.C. § 1391(b).

in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## I.      Introduction

Cooksey was the principal of Wadsworth Elementary School ("Wadsworth") in Chicago from 2003 until 2013.  She brings this suit against CPS primarily based on the allegedly discriminatory actions of Judith Coates, who served as Cooksey's supervisor from October 2009 until July 31, 2011.  In particular, Cooksey takes issue with the following: (1) a negative performance review that Coates gave Cooksey in December 2010; (2) Coates' decision to put Cooksey on a "Direct Assistance Plan" ("DAP") in January 2011; (3) Coates' decision to discipline Cooksey in January 2011 and suspend Cooksey for three days without pay after alleged safety breaches at Wadsworth; (4) the alleged retaliation against Cooksey Coates

---

[2]  The facts in the background section are taken from the parties' Local Rule 56.1 statement of facts and construed in the light most favorable to Cooksey.  CPS's Rule 56.1 statement is referred to as "Def. L.R. 56.1," Cooksey's response to that statement as "Pl. L.R. 56.1 Resp.," and CPS's reply as "Def. L.R. 56.1 Reply."  Cooksey's 56.1 statement of additional facts is referred to as "Pl. L.R. 56.1," and CPS's response to that statement as "Def. L.R. 56.1 Resp."  The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage."  *Omnicare*, 629 F.3d at 704.  In accordance with its regular practice, the court has considered the parties' objections to statements of fact and included in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.

In its Rule 56.1 reply (dkt. 65) and response to Cooksey's statement of additional facts (dkt. 64), CPS moved to strike several of Cooksey's exhibits.  The court will address these motions as necessary.  Where Cooksey supports disputes with citations to the record, including those additional statements which are inappropriately included in plaintiff's response to defendant's statement of facts, see *Malec* v. *Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000), the court adopts those statement in the interests of justice and expediting the litigation.  Where, however, Cooksey makes blanket denials of all allegations in a given paragraph and then fails to support her denial with any statements or citations that actually refute CPS's statements of facts, the court credits CPS's assertions.  *See, e.g., Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.").  The court also will not consider any unauthenticated exhibit.  *See Teamsters Local 673* v. *Oberweis Dairy, Inc.*, No. 12 C 1438, -- F. Supp. 2d ----, 2013 WL 4501436, at *3 (N.D. Ill. Aug. 22, 2013) (citing *Rosemary B. on Behalf of Michael B.* v. *Bd. of Educ. of Comm. High. Sch. Dist. No. 155*, 52 F.3d 156, 159 (7th Cir. 1995)).

engaged in after Cooksey appealed the January 2011 suspension; (5) Coates' decision to put Cooksey on a "Corrective Action Plan" ("CAP") in May 2011; (6) Coates' decision to require Cooksey to host summer school at a school other than Wadsworth during the summer of 2011, even though Cooksey had hosted summer school the previous summer; (7) Coates' general behavior towards Cooksey.

In addition to Cooksey and Coates, some of the most relevant individuals to this motion are (1) Clarice Jackson-Berry, the president of the Chicago Principals and Administrators Association, to whom Cooksey turned with her complaints about Coates; (2) Duane Turner, the vice principal of Wadsworth; and (3) Venesa Woods-Andrews, Coates' former assistant. Other persons relevant to this motion include other CPS principals supervised by Coates and will be discussed below.

## II.    Cooksey's tenure at CPS

### A.    Wadsworth Elementary School

Cooksey, who was born in 1956, was the principal of Wadsworth Elementary School ("Wadsworth") in Chicago from 2003 until she retired on June 30, 2013.[3]  As of 2009, Wadsworth had approximately 325 students in grades pre-kindergarten through fifth grade,

---

[3] Cooksey argues that although she technically retired, she feels that she was constructively discharged. (Dkt. 45, Ex. 1 ¶ 2; Pl. L.R. 56.1 Resp. ¶ 1.)  But her apparent claim for constructive discharge in this suit fails.  "To state a claim for a constructive discharge theory of discrimination, a plaintiff must first demonstrate that he was, in fact, constructively discharged—'that the defendant made the working conditions so intolerable as to force a reasonable employee to leave.'" *Bradley* v. *State of Ill. Dep't of Pub. Aid*, No. 98 C 4987, 2000 WL 1738344, at *1 (N.D. Ill. Nov. 21, 2000) (internal quotation marks and citation omitted).  Cooksey did not raise this claim prior to her summary judgment briefing. Furthermore, Cooksey did not retire until two years after Coates left CPS and the conduct alleged in this lawsuit ceased, nor did she allege sufficient facts to make out this claim.

taught in approximately 14 classrooms.   Cooksey testified in her deposition that, as principal, she was ultimately responsible for the performance of the students in her school.

CPS measures school performance in part through a performance assessment test that scores schools out of a maximum 42 points.  One way in which principals in Cooksey's area ("Area 15") could improve their performance was to rely on data provided to them by their area office.  Although Cooksey's assistant principal, Turner, stated that he used this data to create professional development workshops for teachers to help them understand individual students' needs, Cooksey stated that she never understood the data presented to her.  Wadsworth's performance assessment score at the end of 2010 and beginning of 2011 was 9 out of 42.  Moreover, Wadsworth had been on probation with CPS since 2007, meaning that the school was below standards based on a set of CPS criteria.  (*See* Dkt. 33, Ex. 1 at 19:10-12.)  There were students at Wadsworth who could not read at grade level, which Cooksey said was unacceptable to her and should have been unacceptable to whomever supervised her.  (*See id.* at 19:19-20:9.)

Coates supervised Cooksey and the other principals in Area 15 from October 2009 until July 31, 2011.  Before being supervised by Coates, Cooksey had never been disciplined and had never been placed on a DAP or CAP.[4]  Cooksey and other principals in Area 15 attended weekly meetings with Coates.  Cooksey presented once at these meetings and spoke up sometimes.[5]

_____

[4] Pursuant to CPS' Professional Support and Remediation of Contract Principals Policy, principals whose performance needed improvement could be supported through a DAP or CAP.

[5] Cooksey states that Coates told Cooksey that she "talked too much" at principals' meetings. (Pl. L.R. 56.1 Resp. ¶ 10.)

## B.      Cooksey's December 2010 Performance Review

Because of Wadworth's low performance assessment score, when Coates reviewed Cooksey's performance on December 2, 2010 ("the December 2010 review"), she gave Cooksey ratings of two out of a possible four points across the board, which translated to an overall assessment of "needs improvement." Coates' assessment highlighted (1) that Wadsworth had been on probation for three years in a row; (2) that its reading and science scores were declining (although its math and composite scores showed increases); (3) Wadsworth's "downward trend in attendance"; and (4) its "systematic absence of instructional guidance and individual teacher/classroom oversight by the principal." (Dkt. 33, Ex. 10.) Around the same time as the December 2010 review, Cooksey completed two self-assessments using the same four-point scale. She gave herself scores ranging from two to four.[6]

## C.      The DAP and CAP Improvement Plans

Due to Wadsworth's low performance assessment score and Cooksey's December 2010 review, Coates placed Cooksey on a DAP on January 5, 2011. The DAP provided that Cooksey would receive a mid-term review on May 19, 2011, and could be placed on a CAP at that time if she had not made any progress. The DAP required Cooksey to give periodic reports and other

---

[6] There is a dispute regarding whether these self-assessments are "drafts" or not, with Cooksey insisting that they are entitled to no weight because they are not the final versions. Exhibit H to CPS's summary judgment motion (dkt. 33, Ex. 11) includes what looks like two versions of the same base form that Cooksey completed. The scores Cooksey gives herself on both versions are roughly the same. Cooksey referred to the assessment as a "working document" in her deposition without clarifying if she was referring just to one version of the assessment or to both. (Dkt. 33, Ex. 2 at 169:16-181:10.) Regardless, Cooksey's self-assessments, even in draft form, are relevant to Cooksey's opinions of her own performance and admissible as non-hearsay admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A); *S. Ctr. Bank & Trust Co.* v. *Citicorp Credit Servs.*, 863 F. Supp. 635, 645-46 (N.D. Ill. 1994) (construing draft letter as admission of party opponent even though letter contained "crossed out sentence" because "[a] statement, once made, is no less a statement simply because its maker has changed his or her mind").

plans for and assessments of her school to Coates, the Local School Council ("LSC")[7] for

Wadsworth, and others, and to hold evening meetings to make it easier for stakeholders to

attend. Cooksey has admitted that even before Coates put her on the DAP, she was doing most

of what the DAP required her to do. (Dkt. 33, Ex. 2 at 181:15-182:12.)

Coates and Cooksey met on May 19, 2011 to discuss the DAP, at which time Coates put

Cooksey on the CAP, starting on June 16, 2011. The CAP is a more severe measure than a

DAP.[8] Coates took this action based on her belief that Cooksey had failed to comply with most

of the expectations described in the DAP.[9] Specifically, Coates believed that Cooksey failed to

provide a focused plan to improve instructional outcomes, failed to follow the format for written

weekly teacher meeting reports, and otherwise failed to show successful progress under the

DAP. Cooksey claims Coates did not visit Wadsworth enough to know if any improvement was

being made, which Coates does not contradict.

---

[7] An LSC is made up of parents, teachers, and community members and it plays role in decision making at the local school level.

[8] Jackson-Berry testified that DAPs were created because they involved "no punishment" and "no real structure except the format, the way it is—the papers it has to be written on, the form is uniformly done." (Dkt. 45, Ex. 2 at 23:10-17.)

[9] Cooksey points to portions of Burnett's testimony in which Burnett said she did not understand an aspect of the DAP or CAP or could not give an opinion on it to argue that Burnett testified Cooksey had complied with the DAP and/or CAP. (See, e.g., Dkt. 46, Ex. 1 at 92:19-93:9; Pl. L.R. 56.1 ¶¶ 7-8.) The court will consider this testimony to the extent that it reflects Burnett's personal knowledge of the DAP, CAP, and Cooksey's actions but largely agrees with CPS's argument that Cooksey at time overstates her characterizations of Burnett's testimony. (See Def. L.R. 56.1 Resp. ¶¶ 7-8.) The court also notes that Burnett was "not in charge of managing or monitoring the DAP or CAP" and that she was away from work due to an illness from January until April or May of 2011. (Dkt. 46, Ex. 1 at 55:10-18.)

After being put on the DAP and CAP, Cooksey's job title, duties, and salary remained the same. Cooksey admitted in her deposition that neither a DAP nor a CAP constitutes discipline.[10]

Cooksey's CAP bore some similarities to the CAP that another Area 15 principal, Lori Lennix, received. Coates' subordinate Venesa Andrews testified that Coates asked her to write a draft CAP for Cooksey and emailed her "three CAPs from prior employees before I had come and asked me to go through and find—and this was a quote, find the absolute worst information and put it in" Cooksey's CAP. (Dkt. 46, Ex. 2 at 51:12-17.) Andrews took "worst information to mean anything showing the principal being incompetent." (*Id.* at 51:19-21.) Andrews protested that she could not create the CAP because she had not observed Cooksey and would not know what to put in the CAP. Andrews testified that Coates responded that it did not matter because "a bad principal is a bad principal. Just cut and paste as needed." (*Id.* at 52:1-2.) In the end, Coates drafted the CAP herself.

### D. Cooksey's Supervision of Summer School at Doolittle

Cooksey also complains about Coates' decision to assign Cooksey to supervise summer school during the summer of 2011. Supervising summer school was one element of the CAP and was intended to help Cooksey "[l]ead by example, exhibiting high ethics and moral leadership

---

[10] CPS objects to testimony by Jackson-Berry regarding the impact of a DAP or CAP because it argues that Jackson-Berry was testifying as an expert but was not disclosed as one. Jackson-Berry testified that DAPs are not serious (*see* dkt. 45, Ex. 3 at 247:8-13) but that CAPs change the nature of a principal's employment. (*See id.* at 22:14-23:9.) She also equated being put on a CAP to taking on a second job because of the extra work it involves for a principal. (*Id.* at 25:16-19.)

The court will consider Jackson-Berry's testimony to the extent she is testifying regarding her personal knowledge of Cooksey's plan but not as an expert. Moreover, the court will disregard any statement of Jackson-Berry's for which Cooksey has laid insufficient foundation and is instead based on Jackson-Berry's personal opinions. *See, e.g., Cleveland* v. *Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994).

and a strong belief that all children can learn." (Dkt. 33, Ex. 16 at 3.) Cooksey was one of nine CPS principals in her area in charge of supervising summer school that year.

Cooksey believed it was unfair to make her supervise summer school during the summer of 2011 because she had also overseen summer school the previous summer. Cooksey testified that in her experience, principals generally alternated the summers for which they were responsible for summer school, "So if you had it one year, you knew you weren't going to have it the next year." (Dkt. 33, Ex. 1 at 29:7-10.) Cooksey, however, was not the only principal Coates assigned to supervise summer school two years in a row. She had also assigned Ginger Bryant, Macqueline King, Lennix, Cynthia Miller, and Pamela Strauther-Saunders to do so. There was no written policy against assigning principals to supervise summer school two years in a row. Moreover, even if principals were not assigned to supervise summer school, they were still expected to work full-time during the summer.

Cooksey also complains about the fact that Coates assigned Cooksey to supervise summer school not at Wadsworth but at another CPS location, Doolittle. Coates explained that she assigned Cooksey to Doolittle because the principal of Doolittle, who would otherwise have supervised summer school there, was on leave of absence and Coates did not believe anyone else was available. Another principal, Charles Asyanbi, testified that he only knew of one other Area 15 principal required to host summer school outside of his or her own school, but King explained that a principal who did not host summer school was expected to assist a principal at another school who did. (Dkt. 47, Ex. 3 at 23:2-24:20.)

Cooksey also complains that Coates required her to draft a safety plan for Doolittle for that summer but did not require this of other principals. She further laments that Coates asked a

security guard at Doolittle, Clinton Smith, to "report to her every Friday what's going on in the school." (Dkt. 50, Ex. 4 at 11:21-24.) Smith told Cooksey about Coates' request and Cooksey told Smith not to follow Coates' orders because "I am your immediate supervisor and if she needed to know what's going inside the school she should contact me." (*Id.* at 12:2-6.) Coates never followed up with Smith.[11]

### E.     Cooksey's Three-Day Disciplinary Suspension

On January 5, 2011, Cooksey received a notice of a pre-disciplinary hearing for negligently supervising students and failing to comply with laws or rules governing health, safety, or sanitary of the school. Coates gave Cooksey three reasons for the pre-disciplinary hearing: (1) the practice of keeping the door at Wadsworth to the pre-kindergarten and kindergarten open to give parents the ability to drop off and pick up their children without having to ring the doorbell;[12] (2) doors at Wadsworth being improperly numbered, which made it unclear to staff which doors to use in the case of an emergency evacuation procedure; and (3) Cooksey's failure to provide Coates in a timely manner with emergency contact information for a family involved in an incident at Wadsworth in 2010. Coates initiated the disciplinary after

---

[11] Cooksey asserts that Coates asked Smith to specifically report to Coates on Cooksey. But in response to the question, "Did you understand [Coates] to be asking you to report on what Ms. Cooksey was doing?" Smith replied, "No." (Dkt. 50, Ex. 4 at 13:4-8.)

[12] Turner testified that Wadsworth did not have a practice of keeping the door to the pre-kindergarten area open. (*See* dkt. 45, Ex. 6 at 83:10-85:3.) As discussed below, however, the Seventh Circuit has explained that the mere fact an employer was incorrect in its investigation or ultimate decision is insufficient to defeat a motion for summary judgment. *See Green* v. *Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999).

CPS's risk manager, Celeste Sullivan, instructed Coates to "correct the situation."[13]  (Dkt. 33, Ex. 5 at ¶ 47.)

Cooksey's pre-disciplinary hearing was held on January 25, 2011.  After the hearing, Coates suspended Cooksey for three days without pay, to be effective on April 18, 19, and 20, 2011.  Cooksey appealed the disciplinary action, and Coates' decision was upheld by Cheryl Colston, CPS's director of employee relations.

### F.    Retaliation

Although not entirely clear, Cooksey's testimony indicates that she believes she was retaliated against for appealing her three-day suspension.  She noted that "after the appeal, it just really escalated" and that she was assigned to summer school after the appeal.  (Dkt. 33, Ex. 1 at 123:17-124:7.)  She went on to testify that she "wouldn't say that the appeal caused me to get a CAP" and that, "based on how [Coates] was discriminating against me, I believe that I still would have gotten a CAP" even if Cooksey had not appealed the suspension.  (*Id.* at 125:1-10; 127:12-20.)  She also admitted that "there was a possibility" Cooksey would have been assigned to supervise summer school even if she had not appealed her suspension.  (*Id.* at 127:21-128:1.)

Cooksey never told CPS that she thought Coates was discriminating against her based on age.  Instead, she told Jackson-Berry, the president of the Principals Association.  Cooksey began to "cc" Jackson-Berry on emails during the 2010-2011 school year.  Jackson-Berry decided to contact Cooksey after receiving "enough of them that I got worried and decided to get in touch with her to find out what this was all about."  (Dkt. 45, Ex. 2 at 12:19-24.)  After

---

[13]  Cooksey acknowledged that neither Sullivan nor the CPS employee who discovered the security issues was aware of Cooksey's age or discriminated against her on that basis.  (Dkt. 33, Ex. 1 at 162:3-9.)

speaking with Cooksey, Jackson-Berry felt that some things Cooksey indicated were being said or done to her were "inappropriate." (*Id.* at 14:5-13.) Cooksey also told Jackson-Berry that she felt she was not being properly supported and did not have a "fair and collegial relationship with her supervisor."[14] (*Id.* at 15:12-20.)

After hearing from Cooksey and receiving similar complaints about Coates from two other, more senior, principals, one of whom was Lennix,[15] Jackson-Berry met with Coates. Jackson-Berry contacted Coates again after Cooksey received the CAP because Jackson-Berry felt some elements of it were "inappropriate," "abusive," and "valueless assignments."[16]

Jackson-Berry also spoke to the CEO of CPS at the time, Ron Huberman, and a member of the CPS human resources department, Alicia Winckler, regarding general complaints she had received about Coates and another employee. Jackson-Berry also discussed "on behalf of

---

[14] CPS argues that this testimony is inadmissible hearsay such that the court cannot consider it on a summary judgment motion. *See Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). The court can consider this evidence, however, pursuant to Federal Rule of Evidence 803(1) or (3). *See* Fed. R. Evid. 803(1) (excluding from the rule against hearsay "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"); *id.* at 803(3) (excluding from the rule against hearsay "[a] statement of the declarant's then-existing state of mind . . . or emotional, sensory, or physical condition"); *see also E.E.O.C.* v. *Univ. of Chicago Hosps.*, 276 F.3d 326, 333 (7th Cir. 2002) (witness's statement that declarant told him "it looked like she was going to get fired" was admissible under Rule 803(3) because it was used not for the truth of the matter asserted but to show declarant's state of mind about her job).

[15] CPS argues that Lennix's complaint to Jackson-Berry is inadmissable hearsay. To the extent that it is not being offered for its truth but instead to demonstrate its effect on the listener (*i.e.*, inciting Jackson-Berry to meet with Coates), it is non-hearsay. *See, e.g., Dell'Aringa* v. *SBC Global Servs., Inc.*, No. 01 C 4995, 2002 WL 31109447, at *2 n.3 (N.D. Ill. Sept. 20, 2002) (statement "offered not for its truth or falsity but for the relevant purpose of showing [the plaintiff's] belief" was "admissible for the non-hearsay purpose of showing its effect on the listener").

[16] CPS again moves to strike reliance on this testimony, insisting that it contains inadmissible speculation and purported expert testimony from a lay witness. (*See* Def. L.R. 56.1 Resp. ¶ 27.) To the extent that Jackson-Berry is explaining why she felt she needed to speak with Coates again, however, the court can consider this testimony.

Cooksey" difficulties Wadsworth had with a charter school sharing its building, explaining that it was "pushing her out of space, taking, you know, liberties that they shouldn't have."  (Dkt. 45, Ex. 2 at 138:18-22.)

Cooksey also filed a complaint with the Chicago Commission on Human Relations ("the Commission") on June 11, 2011 about Coates' behavior.  Finding no substantial evidence of any ordinance violations by CPS and concluding that CPS provided "legitimate, non-discriminatory reasons for placing Complainant on a DAP and a CAP, as well as the issuing of the January 5, 2011 pre-disciplinary notice," the Commission dismissed Cooksey's case on April 19, 2012. (Dkt. 33, Ex. 26 at 5-6.)  The EEOC, which investigated the complaint pursuant to Cooksey's charge, was unable to conclude that CPS violated any statutes.

### G.     Hostile Work Environment

Although Cooksey does not explicitly state so in her complaint, she seems to be alleging a hostile workplace environment claim based on Coates' general treatment of her.  Cooksey points to Coates telling Cooksey at a principals' meeting she talked too much.[17]  Coates spoke to Cooksey in a "nasty tone" with a "frown on her face."  (Dkt. 33, Ex. 1 at 114:6-117:7.) Cooksey also notes that during her meetings with Coates, Coates would leave the door to her office open with Coates' assistant sitting outside.  Cooksey also argues that Coates did not provide the support she needed and did not adequately observe Cooksey in making the decisions to put her on the CAP and DAP.[18]

---

[17]  Cooksey admits, however, that Coates did not tell other principals who were as old or older than Cooksey that they spoke too much.

[18]  Cooksey argues that Coates also fabricated a story about having to wait outside of the school for an hour to be let in when she was actually only there for less than two minutes.  In support, Cooksey

(continued...)

Coates also treated Cooksey in a manner that Turner found disrespectful when Cooksey and Turner attended a community meeting at Emmett Till elementary school after there had been a shooting in the Woodlawn area of Chicago. Turner testified that all administrators were directed to attend the meeting but when Turner and Cooksey arrived, Coates "was standing at the top of the stairs and said to both of us, what are you doing here; you should not be here; why aren't you back at your school." (Dkt. 45, Ex. 6 at 13:4-7.) Turner also felt Coates was disrespectful of Cooksey when she "was very sharp in her tone in terms of questioning—making statements and questions about how Mrs. Cooksey had organized and arranged the summer program" at Doolittle. (*Id.* at 14:18-15:3.) Moreover, Cooksey told Turner she felt Coates treated her in a disrespectful manner when she received her DAP and CAP and that Cooksey was not given expectations for how to meet the plans' requirements or evidence for why she was receiving the plans.[19] Turner testified that Coates also disrespected Cooksey at an LSC meeting

---

(...continued)
relies on unauthenticated images from a security video and Jackson-Berry's testimony about what she saw on the security video tape. The images pulled from the tape are inadmissible because they are unauthenticated, in addition to being difficult to decipher. *See Woods* v. *City of Chicago*, 234 F.3d 979, 989 (7th Cir. 2000) ("[U]nauthenticated documents generally cannot be considered on a motion for summary judgment[.]"). Jackson-Berry's testimony about what she saw on a video (that was never submitted to the court) cannot be considered to prove the contents of the video. *See Quantum Mgmt. Grp. Ltd.* v. *Univ. of Chicago Hosps.*, No. 99 C 2248, 2000 WL 1221632, at *5 (N.D. Ill. Aug. 18, 2000). Cooksey also relies on the testimony of Turner that the security guard at the school told Turner he was at his desk the whole morning and would have seen a visitor, but this testimony is obviously hearsay.

Cooksey also challenges Coates' decisions to give Cooksey a negative performance review and place her on the DAP and CAP as not being based on any scores or studies. She cites to a portion of Coates' deposition where Coates was asked if she took certain scores and studies into account and Coates said no. (Dkt. 45, Ex. 4 at 126:14-22.) Cooksey's position is a misreading of Coates' testimony. In fact, Coates testified just after this disputed exchange that she was concerned Cooksey was not investigating ways to improve Wadsworth in light of poor data about the school's performance. (*Id.* at 126:23-127:17.)

[19] As noted in note 15, *supra*, this testimony is admissible under the exception to the rule against
(continued...)

when Coates said Wadsworth had not sent certain materials home to parents even though it had. Cooksey also felt slighted at principals' meetings when Coates would not allow her to bring her assistant principal although other principals could, and when she could not bring Turner to her individual meetings with Coates.

Jackson-Berry testified that she felt Coates treated Cooksey poorly and unfairly. Jackson-Berry and Coates toured Wadsworth together at Jackson-Berry's suggestion and Jackson-Berry noted that she and Coates "had such an enjoyable afternoon in the classrooms with the teachers who were doing their regular lessons" that Coates wrote complimentary notes to teachers whose classes she observed. (*Id.* at 27:17-20.) Coates did not take Jackson-Berry to see anything that Coates said she felt was inappropriate or reflected badly on Cooksey.

Jackson-Berry also met with Cooksey at some point during Cooksey's CAP to review the materials Cooksey had created and assembled to comply with the CAP requirements. From the materials she examined, Jackson-Berry felt that Cooksey had complied with the CAP's requirements, although she admittedly never saw Cooksey perform many of the tasks required by the CAP. After reviewing Cooksey's CAP materials, Jackson-Berry attended an LSC meeting at Wadsworth where Coates criticized Cooksey in front of the LSC about the students' progress and that the school was not well run.[20] When Cooksey "spoke up for herself a couple of times, the responses or the narrative about her from Ms. Coates became very pointedly more hostile in front of the local school council." (*Id.* at 35:5-9.) Jackson-Berry confronted Coates outside of

_____

(...continued)
hearsay for existing state of mind. *See Univ. of Chicago Hosps.*, 276 F.3d at 333; Fed. R. Civ. P. 803(3).

[20] Paragraph 53 of Cooksey's statement of additional facts regarding the LSC is stricken because it is inadmissible hearsay. (Pl. L.R. 56.1 ¶ 53.) Additionally, the court will not consider Cooksey's Exhibit 21, as it is unauthenticated. *See Teamsters Local 673*, 2013 WL 4501436, at *3.

the building at the end of the LSC meeting and Coates told her she thought Cooksey had fabricated all of the materials she used to show she was in compliance with the CAP.[21]

## III.    Comparators

### A.    "Younger" Principals

#### 1.    Charles Asyanbi

Cooksey points to Asyanbi as a more favorably treated younger principal. His school, Emmett Till, had a performance assessment score lower than Cooksey's in December 2010. Because he had only been in his position for approximately six months at that point, Coates did not believe he had sufficient time to make an impact at his school. She did not rate his performance or place him on a DAP or CAP.

Asyanbi was also required to host summer school two years in a row, 2011 and 2012, although he hosted summer school at Emmett Till and was not required to draft a separate safety plan. Moreover, while Coates told Cooksey to hold her LSC meetings at times of day other than in the afternoon, such as the evening hours, Asyanbi held his LSC and parent meetings at 11:30 a.m. and his teacher conferences and faculty meetings at 8:30 or 9 a.m. (although he did not testify as to whether Coates told him to hold meetings at different times).

#### 2.    Macqueline King

---

[21] The court will not consider paragraphs 39 and 40 of Cooksey's statement of additional facts because they are comprised entirely of hearsay. Even though a discriminatory statement made by the alleged discriminator is admissible nonhearsay under Federal Rule of Evidence 801(d)(2)(D), Jackson-Berry testified that someone told her that Coates made discriminatory statements. This is double hearsay and has no indicia of reliability. *See Baron* v. *City of Highland Park*, 195 F.3d 333, 339 (7th Cir. 1999) (comment by plaintiff's coworker that plaintiff's superior made discriminatory conduct was inadmissible to support plaintiff's ADEA claim). The first half of paragraph 54 is stricken for the same reason. (Pl. L.R. 56.1 ¶¶ 39, 40, 54.)

Macqueline King, the principal of Dumas, was also a younger principal Cooksey alleges was treated better than she. King's school had an overall performance assessment score of 24 out of 42 points and she was not placed on a DAP or CAP. King was not required to revise her emergency plan for the summer school session, but she was required to host summer school two years in a row, 2010 and 2011. King held her parent meetings at 8:30 a.m. and did not recall if Coates ever talked to her about holding them at different times.

### 3. Colleen Conlan

Conlan was the principal of Canter Leadership Academy, which had a performance assessment score of 22 out of 42. The record does not indicate she was placed on a DAP or CAP. Conlan was also required to host summer school. She hosted summer school for one year at a school other than her own during her second year as a principal but did not recall if she was required to create a safety plan for that summer.

### 4. Sonia Spiller

Coates asked Jackson-Berry to help Sonia Spiller, the principal of Robinson, because of Jackson-Berry and Spiller's personal relationship, and because Spiller was a "brand-new principal" who was "struggling."[22] (Dkt. 45, Ex. 3 at 176:20-177:15.) Jackson-Berry noted that Spiller was a "young, eager person who started her career at" the school where Jackson-Berry had worked. (*Id.*) Jackson-Berry believed Spiller should have been on a DAP but also admitted

---

[22] In her affidavit, Coates lists all the principals in her area with their performance assessment scores. (*See* dkt. 33, Ex. 5 at 10.) Instead of having a score out of 42, Spiller's score is listed as "(3/6) (not enough data)." (*Id.*) Cooksey states in her response brief that Spiller had a score of 3 out of 42. (Dkt. 45 at 10.) She supports this by citing to paragraph 47 of her 56.1 statement of additional facts, but that paragraph does not state what Spiller's score was. Instead, it discusses Jackson-Berry's testimony that Coates asked her to help Spiller and that Jackson-Berry believed Spiller deserved to be on a DAP. (Pl. L.R. 56.1 ¶ 47.)

that she did not know if it was routine to put principals like Spiller who had been in their position for less than a year on a DAP. There is no evidence about Spiller's being required to host summer school.

### B. "Older" Principals

Several principals in Area 15 were the same age or older than Cooksey. Cooksey points to several whom she claims were treated poorly. First, she points to Lori Lennix, the principal of Doolittle. Like Cooksey, Lennix received a "needs improvement" rating and was placed on a CAP from Coates. She was assigned to work with Andrews on the CAP but was subsequently terminated. Lennix's school was one of the few that had a performance assessment score as low or lower than Wadsworth in December 2010, with a 6 out of 42.

Like Wadsworth, Kozminski School also had a performance assessment score of 9 out of 42. Its principal was Lionel Bordelon, another "older principal." Bordelon received a "needs improvement" rating as well, and was ultimately not renewed as principal of his school by his LSC.[23] Cooksey testified that Coates spoke to Lennix and Bordelon in the same disrespectful manner as she did to Cooksey. Lennix testified that Coates once stopped Bordelon in the middle of a presentation he was making. Andrews testified, however, that she believed it was appropriate for Bordelon to be removed from his position because of his school's poor performance. Finally, Cooksey also points to Mary Rogers as an older principal. Rogers was eventually terminated, although the record lacks further details about her.

---

[23] Cooksey notes that Bordelon has filed a complaint against CPS alleging age and racial discrimination based on actions taken by Coates. But "this evidence, at least in its current form, is hearsay and therefore may not be considered on summary judgment." *Baikie* v. *Cook Cnty. Sheriff's Dep't of Corrs.*, No. 10 C 6022, 2012 WL 1068774, at *7 (N.D. Ill. Mar. 29, 2012) (complaint from separate lawsuit constituted inadmissible hearsay).

## ANALYSIS

**I.      Exhaustion of Administrative Remedies**

A plaintiff may not bring a claim for discrimination under the ADEA in federal court without first filing a charge before the EEOC. *Ajayi* v. *Aramark Bus. Servs., Inc.*, 336 F.3d 520, 527 (7th Cir. 2003); *see also* 29 U.S.C. § 626(d). In turn, the claims alleged in the plaintiff's complaint must be "like or reasonably related to the EEOC charges" and "reasonably . . . expected to grow out of an EEOC investigation of the charge." *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 550 (7th Cir. 2002) (quoting *Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995)). Claims are deemed reasonably related if there is a factual relationship between them. *Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). "This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*." *Id.* (emphasis in original). The purpose of this rule is to "afford[] the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion . . . and [give] the employer some warning of the conduct about which the employee is aggrieved." *Id.* (citation omitted)

Cooksey's suit points to six instances of discrimination: (1) her December 2010 performance evaluation; (2) the January 2011 DAP; (3) the three-day disciplinary suspension in January 2011; (4) the June 2011 CAP; (5) her assignment to supervise summer school in 2011; and (6) the way Coates treated Cooksey in general, including Coates' allegedly untrue statements about Cooksey and the manner in which Coates spoke to Cooksey.[24] (Def. L.R. 56.1 ¶ 47.)

---

[24] Cooksey argues that her suit also complains about events that occurred after she filed her EEOC charge on July 19, 2011. (Pl. L.R. 56.1 Resp. ¶ 47.) As CPS points out, the court already denied

(continued...)

19

Cooksey also alleges that she was retaliated against for appealing the January 2011 disciplinary suspension.  (Compl. ¶¶ 17-18, 25-26.)  Her EEOC charge, however, outlines a narrow scope of allegedly discriminatory actions, stating, "During my employment, I have been subjected to different terms and conditions, including, but not limited to, job tasks, scrutiny, and lack of assistance, while other younger employees have not.  I have been disciplined and suspended.  I believe I have been discriminated against because of my age, 54, . . . in violation of the Age Discrimination in Employment Act of 1967, as Amended."  (Compl., Ex. 1.)

CPS argues that Cooksey's suit is limited to the claims stated in her EEOC charge.  In particular, CPS argues Cooksey is limited to pursuing claims for her January 2011 disciplinary suspension, the DAP, and the CAP, because she "failed to allege retaliation or hostile work environment, check the 'continuing action' box or otherwise apprise the EEOC of any complaints other than those" listed above.  (Dkt. 31 at 5.)  Cooksey disputes this rationale, arguing that she can pursue all allegations in her complaint because they are "reasonably related to and grow out of those raised in the discrimination charge."  (Dkt. 47 at 4.)

---

(...continued)
Cooksey's motion to amend this suit to add allegations that a different CPS employee, Chief of Schools John Price, allegedly discriminated against her (dkt. 41), and denied reconsideration of that ruling (dkt. 60).  The court stated both in open court and in ruling on the motion to reconsider that Cooksey would suffer no prejudice by filing a separate lawsuit against CPS regarding the Price allegations (dkt. 41; dkt. 60 at 3), which Cooksey did.  *See* Complaint, *Cooksey* v. *Board of Education of the City of Chicago* (No. 13 C 8619), N.D. Ill. Dec. 2, 2013 (ECF 1).  Accordingly, the court will not consider Cooksey's allegations that relate to that suit as opposed to the current action.

## A.       Performance evaluation and other alleged conduct by Coates

Cooksey's allegations regarding her performance evaluation and other conduct by Coates that led to an allegedly hostile work environment are closely enough related to the claims stated in her EEOC charge that she may pursue them in this suit.  Applying *Cheek*'s two-part test, and taking into account the fact that Cooksey is a layperson, not a lawyer (and there is no indication she was represented by counsel when she filed the charge), the court finds that her complaints about her performance evaluation and other alleged mistreatment by Coates are reasonably related to and could grow out of her EEOC charge.  Cooksey's failure to check the "continuing action" box is not fatal to her allegations that she was discriminated against on her December 2010 performance evaluation and by Coates' actions from November 2010 through July 2011. *See, e.g., Malozienc* v. *Pac. Rail Servs.*, 606 F. Supp. 2d 837, 859 (N.D. Ill. 2009) ("[T]his Court declines to deem a *pro se* Plaintiff's failure to check the 'continuing action' box as fatal to his claim [of discrimination on a continuing basis].").  She stated on her EEOC charge that she was subject to greater "scrutiny" than her younger colleagues.  This could conceivably include her 2010 performance review insofar as she argues that she was reviewed more harshly because of Coates' alleged discrimination.  That she was assigned to teach summer school two years in a row could fall under the more onerous "job tasks" she stated in the EEOC charge that she endured as compared to younger colleagues.  Finally, her general argument of mistreatment by Coates falls under various allegations she made in the EEOC charge.  To the extent that Cooksey alleges she was held to different standards than younger principles, and was not given support or guidance given to other principals or individuals placed on DAP/CAPs, she alleged this in her

EEOC charge by saying she was subject to scrutiny and "lack of assistance." The court will thus consider these claims on their merits.

**B.     ADEA Retaliation**

By not including retaliation in her EEOC charge, however, Cooksey forfeited that claim in this suit. The Seventh Circuit has explained, "Normally, retaliation and discrimination charges are not considered 'like or reasonably related' to one another." *Swearnigen-El* v. *Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864-65 (7th Cir. 2010) (quoting *Sitar* v. *Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003)). Where there "is no mention of retaliation or any other words to that effect" in an EEOC charge, a district court may properly enter summary judgment on the defendant's behalf on a retaliation claim in the complaint. *Steffen* v. *Meridan Life Ins. Co.*, 859 F.2d 534, 544-45 (7th Cir. 1988).

Because Cooksey did not mention retaliation or check the "retaliation" box on the EEOC charge, CPS argues that she cannot pursue this claim. The cases Cooksey relies on in opposition are all distinguishable because the EEOC charges in them specifically mentioned some sort of retaliatory conduct, even if they failed to check the "retaliation" box. *See Griffin* v. *Sutton Ford, Inc.*, 452 F. Supp. 2d 842, 846 (N.D. Ill. 2006) (plaintiff alleged in her EEOC complaint that she had "repeatedly . . . complained to management" about alleged sexual harassment and that "similarly situated employees who did not complain about sexual harassment were not subjected to such treatment"); *Caratachea* v. *Homewood Indus.*, No. 01 C 9845, 2002 WL 31207200, at *1 (N.D. Ill. Oct. 2, 2002) (plaintiff could pursue retaliation claims even though she did not "raise any specific allegations of retaliatory dismissal in her EEOC charge" but she did allege that "her complaints about the sexual harassment to her supervisors failed to lead to redress"); *Garcia* v.

*Fry*, 972 F. Supp. 1133, 1136 (N.D. Ill. 1997) (plaintiff could pursue retaliation claims where she wrote in her EEOC charge that she believed she was "being retaliated against for assisting in a sexual harassment investigation").

Not only did Cooksey fail to check the "retaliation" box, she also failed to allege any retaliatory conduct in her EEOC charge. CPS's motion for summary judgment on Count II of Cooksey's complaint is granted.

## II.     ADEA Discrimination Claim (Count I)

The ADEA prohibits employers from discriminating against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a)(1); 631(a). A plaintiff claiming ADEA discrimination can prove her case under the indirect or direct method of proof. *See Van Antwerp* v. *City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010). Cooksey proceeds under both.

### A.     Indirect Method

Under *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a plaintiff relying on the indirect method at summary judgment must show that (1) she was a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably. *Fleishman* v. *Continental Cas. Co.*, 698 F.3d 598, 609 (7th Cir. 2012) (quoting *Franzoni* v. *Hartmax Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002)).; *Ptasznik* v. *St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff makes this showing, the burden shifts to the defendant to provide a legitimate nondiscriminatory explanation for the adverse action. *Fleishman*, 698 F.3d at 609. The burden then shifts back to the plaintiff who must raise a question of fact regarding whether

her termination was pretextual.  *Id*.   CPS argues that Cooksey failed to meet her *prima facie* burden because Cooksey cannot show that she was meeting CPS's legitimate expectations, the only adverse employment action she suffered was the three-day suspension, and she failed to identify other similarly situated employees outside of her protected class who were treated more favorably.[25]

### 1.    *Prima Facie* Case

#### a.    Whether Cooksey Was Meeting CPS's Legitimate Expectations

Cooksey must establish that she was meeting CPS's legitimate expectations at the time of the alleged discriminatory acts.  *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).  Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining whether a plaintiff can make out a *prima facie* case, where "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question [of] whether the employer proffered a nonpretextual explanation for its challenged conduct."  *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008); *see also Keeton* v. *Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012).  Accordingly, whether Cooksey was meeting CPS's employment expectations will be discussed in the pretext analysis below.

---

[25]  CPS does not dispute that Cooksey was a member of a protected class under the ADEA. Cooksey was over 40 years old at the time of the events giving rise to this suit.

b.      **Whether Cooksey Suffered An Adverse Employment Action**

Cooksey asserts that her three-day suspension, her "tainted evaluation," the DAP and the CAP constituted adverse employment actions.[26]  CPS argues Cooksey suffered no adverse employment action other than the three-day suspension.

"Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton* v. *Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011).  Although the Seventh Circuit has "adopted a broad definition of the phrase 'adverse employment action,'" it must still be one that is "materially adverse, 'meaning more than a mere inconvenience or an alteration of job responsibilities.'" *Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (quoting *Oest* v. *Ill. Dep't of Corr*., 240 F.3d 605, 612 (7th Cir. 2001).  An adverse employment action "need not be quantifiable in terms of pay or benefits," *see Atanus* v. *Perry*, 520 F.3d 662, 677 (7th Cir. 2008) (internal citation omitted), but it must be one that causes a

---

[26]  Cooksey does not seem to argue that being assigned to summer school constituted an adverse employment action.  (*See* dkt. 47 at 9-10.)  Even if she did, however, this argument would fail.  All principals were required to work full-time during the summer, some principals were required to oversee summer school two summers in a row, and the fact that Cooksey was required to oversee summer school at a different CPS facility is not so far from the norm as to constitute an adverse employment action.  A difficult work assignment, even one in an unfamiliar district, does not constitute an adverse employment action, especially if the assignment fell within the plaintiff's job description and the plaintiff's job duties or responsibilities did not significantly change in any way. *See Mangano* v. *Sheahan*, No. 00 C 3853, 2002 WL 1821738, at *7 (N.D. Ill. Aug. 7, 2002) (granting summary judgment to defendants on plaintiff's Title VII sex discrimination claim where plaintiff failed to show an adverse employment action as a matter of law and noting that the "realities of the workplace dictate that employees do not always have the option to work in the location they desire") (internal quotation marks and citation omitted).

"tangible employment action," which leads to "a substantial detriment to the plaintiff's employment relationship." *Savino* v. *C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999).

### i.      December 2010 Performance Review

Negative performance reviews are only adverse employment actions if they "result in immediate and tangible consequences such as ineligibility for job benefits like promotion, transfer, or advantageous increases in responsibilities." *Nowak* v. *Int'l Truck and Engine Corp.*, 406 F. Supp. 2d 954, 970 (N.D. Ill. 2005). For example, in *Whittaker* v. *Northern Illinois University*, 424 F.3d 640 (7th Cir. 2005), the plaintiff had not suffered an adverse employment action where she received a negative evaluation, written warnings, and was placed on "proof status" (requiring her to produce proof of sickness to receive sick leave), which were all "putatively disciplinary measures." *Id.* at 648. This was because the reprimands she received did not "carry with them immediate, albeit non-economic, consequences that in and of themselves go so far as to materially alter the terms and conditions of employment." *Id.*

Cooksey's 2010 negative performance review was not an adverse employment action. She was not fired or demoted based on the review, nor did she suffer any sort of financial consequence on its basis. In fact, there were no immediate consequences to Cooksey's ability to continue on with her job except to the extent that the negative performance review led Coates to place Cooksey on the DAP, which in turn led to the CAP. But neither the DAP nor the CAP was an adverse employment action, as discussed below.

## ii. DAP and CAP

The Seventh Circuit has also considered whether plans like the DAP and CAP constitute materially adverse employment actions, and has determined, "Performance improvement plans, particularly minimally onerous ones . . ., are not, without more, adverse employment actions." *Davis* v. *Time Warner Cable of Southeastern Wisc., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011). But an improvement plan is not an adverse employment action merely because it adds to the employee's workload. For example, in *Cole* v. *Illinois*, 562 F.3d 812, 816 (7th Cir. 2009), a performance improvement plan that required the plaintiff to submit daily and weekly schedules to her supervisors did not constitute an adverse employment action sufficient to withstand a motion for summary judgment. "Although the task of preparing daily plans would necessitate some extra work . . . it can be seen as a constructive assignment that, when executed, could improve an employee's work habits and productivity." *Id.*; *see also Smith* v. *Sebelius*, 484 F. App'x 38, 42 (7th Cir. 2012) (plaintiff's retaliation argument failed where she alleged adverse employment actions such as her supervisor giving her too much work, excessively scrutinizing her work, and threatening her with a performance improvement plan because "[s]uch actions generally do not constitute adverse actions of the type likely to dissuade protected activity"); *Boss* v. *Rock Cnty., Wisc.*, No. 02-C-0678-C, 2003 WL 23142224, at *10 (W.D. Wisc. Nov. 26, 2003) (performance improvement plan given "under conditions that made it impossible to meet the plan's standards" did not constitute adverse employment action for purposes of plaintiff's Title VII retaliation claim); *Fitch* v. *Cont'l Cas. Co.*, No. 01 C 1149, 2002 WL 31834877, at *5 (N.D. Ill. Dec. 16, 2002) (performance improvement plan that "had no impact on [plaintiff's] job rating or salary" was not adverse employment action).

Although the DAP and CAP marginally added to Cooksey's workload,[27] having examined the DAP and CAP, the court cannot conclude that either was particularly onerous. Moreover, the goal of both the DAP and CAP was to improve Cooksey's performance and, as a result, to improve the experience for students at Wadsworth. The Seventh Circuit has explained that "while one might argue that 'each oral or written reprimand brought [the plaintiff] closer to termination, such a course was not an inevitable consequence of every reprimand . . . ; rather, job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship." *Whittaker*, 424 F.3d at 648 (brackets omitted) (quoting *Oest*, 240 F.3d at 613). Job improvement was the goal of both the CAP and DAP, and both outlined areas in which Cooksey could and should improve.

Cooksey's claims fall short of what the Seventh Circuit has held to be an adverse action. For example, in the main case on which she relies, *Firestine* v. *Parkview Health Sys., Inc.*, 388 F.3d 229 (7th Cir. 2004), the Seventh Circuit held that the plaintiff had suffered an adverse

---

[27] For example, Cooksey testified that she was required to give Coates written reports of her teacher evaluations and observations while was on the DAP and CAP. (Dkt. 33, Ex. 2 at 266:1-20.) She was also required to give periodic reports and other plans for and assessments of her school to Coates, the LSC, and other Wadsworth stakeholders. As for the CAP, much of it resembled the requirements of the DAP. For example, one goal of both the DAP and CAP was, "Engage broad representation of school in strategic planning." (Dkt. 33, Ex. 13 at 1B; *id.*, Ex. 16 at 1B.) In response to this goal, the DAP required Cooksey to "engage LSC members, teachers, leadership team, students and parents to create an implement a focused plan to improve instructional outcomes at the school." (*Id.*, Ex. 13 at 1B.) The CAP required Cooksey, "along with faculty, parents, staff," and the LSC, to "identify specific, quantifiable issues that cause low student performance and present a written strategy, including a calendar identifying goals and deadlines, for the school year 2011-12 for addressing each issue including reports to update and engage LSC, parents; faculty; and staff." (*Id.*, Ex. 16 at 1B.) There are some requirements in the CAP that added to what Cooksey was required to do under the DAP. For example, the CAP required Cooksey to "meet with teachers bi-weekly to compare and contrast classroom assignments to eliminate repetition and create classroom assignments per grade that demonstrate a gradual increase in complexity of learning as student moves up in each grade level." (*Id.*, Ex. 16 at 3D.) But these additional requirements do not strike the court as being unduly burdensome, especially considering that each requirement should have helped Cooksey's performance as a principal. Even hosting summer school was a way for Cooksey to improve as a principal and implement suggestions in the CAP. (Dkt. 33, Ex. 16 at 3.)

action when she was removed from her job, told to seek another position within the same company and forced to use some of her vacation time to do so, and ultimately the jobs made available to her "paid less, involved entirely different work, and had less desirable hours." *Id.* at 235. Nothing of the sort happened here. Cooksey argues that it is possible that the DAP, CAP, or 2010 performance evaluation could have diminished her job prospects and insists that there "is no doubt that [these acts] negatively affected Cooksey's long-term career." (Dkt. 47 at 10.) But she provides no indication to the court that her career was actually affected in any way. The court also rejects Cooksey's argument that the DAP and CAP were adverse employment actions because they "can provide the basis for further discipline and removal of a contract principal like Cooksey," (*id.*), as she does not show the DAP or CAP led to these results.

Additionally, because Cooksey did not lose any wages as a result of the DAP, CAP, performance evaluation, or hosting summer school, she "has a remedies problem. The ADEA permits reinstatement, back pay, and other 'legal or equitable relief as may be appropriate,' 29 U.S.C. § 626(b), but not 'compensatory damages for pain and suffering or emotional distress.'" *Barton*, 662 F.3d at 454 (quoting *Comm'r of Internal Revenue* v. *Schleier*, 515 U.S. 323, 326, 115 S. Ct. 2159, 132 L. Ed. 2d 294 (1995)). Because the DAP, CAP, and 2010 performance evaluation had no impact on Cooksey's compensation, "an award of back pay is unavailable." *Id.* She thus could only recover for the three-day suspension. The DAP, CAP, and 2010 performance evaluation did not constitute adverse employment actions as a matter of law. The only adverse employment action Cooksey suffered was her three-day suspension.

### iii.    Hostile Work Environment

Although Cooksey did not explicitly plead this claim to the court or the EEOC, her response brief appears to assert a claim for a hostile work environment, which can constitute an adverse employment action to prove discrimination in violation fo the ADEA. *See Barton*, 662 F.3d at 453. The Seventh Circuit has "assumed without deciding that plaintiffs may bring a claim of a hostile work environment under the ADEA." *Fugate* v. *Dolgencorp, LLC*, No. 13-1681, -- F. App'x ----, 2014 WL 321902, at *2 n.1 (7th Cir. Jan. 30, 2014) (citations omitted). To succeed on a hostile work environment claim under the ADEA, "the environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Bennington* v. *Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001). Moreover, the Seventh Circuit has recently reiterated that no remedy is available to an ADEA plaintiff who merely alleges compensatory damages for pain and suffering or emotional distress due to a hostile work environment because "[u]nlike Title VII, the ADEA permits damages only in the form of lost wages (past or future)." *Fugate*, 2014 WL 321902, at *2 n.1.

Here, the only loss of wages Cooksey received was in connection with the three-day suspension because of a security breach in her school. Cooksey does not dispute that the suspension was upheld on appeal and cannot credibly argue that the discipline was imposed merely because of hostility based on Cooksey's age.

Nor could the other allegedly hostile acts and comments by Coates make out a hostile work environment claim. Cooksey has not shown that the few instances in which Coates allegedly embarrassed Cooksey or made allegedly untrue remarks about her were tied to

Cooksey's age. *See Harris* v. *Ashcroft*, 74 F. App'x 669, 673-74 (7th Cir. 2003) ("[T]o prevail on a hostile-work-environment claim there must be some evidence tying the harassment to the plaintiff's membership in a protected class."). Cooksey's hostile work environment claim fails.

### c.    Whether CPS Treated Similarly Situated Employees More Favorably Than Cooksey

Cooksey must also identify similarly situated employees outside of her protected class who were treated more favorably that she. The similarly situated employee inquiry, which calls for a "flexible, common sense" approach, asks whether there are "enough common features between the individuals to allow a meaningful comparison[.]" *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal citation omitted), they need not be "identical in every conceivable way." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). In order to show that these employees were similarly situated, Cooksey must demonstrate that they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 847 (internal quotation marks omitted). Cooksey contends that Coates supervised other principals who were younger than Cooksey and treated better than she.[28] In particular, Cooksey points to Asyanbi, King, Conlan, and Spiller.

---

[28] CPS also notes that Coates herself is two years older than Cooksey. Cooksey is thus "fighting an uphill battle" because this evidence is "significant in evaluating the evidence of discrimination," although "not dispositive." *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 984 n.2 (7th Cir. 1999).

### i.        Asyanbi

Cooksey argues that Asyanbi was treated better than she was treated because he was not put on a DAP or CAP even though his school was performing badly, and because of his treatment regarding summer school.  In doing so, she continuously refers to Asyanbi as a "younger principal."  Although the record is clear that Asyanbi was a "younger principal" in the sense that he had not been in his position for very long when Cooksey was placed on the DAP, the court does not see his actual age anywhere in the record.  This alone prevents Cooksey from using Asyanbi as a comparator.  *See Barricks* v. *Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007).

Even if the record did reveal Asyanbi's age, however, Cooksey would not fare any better. Asyanbi held the same position as Cooksey and dealt with the same supervisor, Coates.  Cooksey argues that even though Asyanbi's school received a lower performance assessment score than Wadsworth (7 out of 42, versus the 9 out of 42 Wadsworth received), Asyanbi was not placed on a DAP or CAP.  CPS argues that Asyanbi was not placed on a DAP or CAP because he had only been the principal of his school for six months.

Cooksey relies on *Coyne* v. *Siemens Information and Communications Networks*, *Inc.*, No. 02 C 1472, 2003 WL 1627597, at *4 (N.D. Ill. Mar. 27, 2003), in which the court rejected the defendant's argument that the plaintiff and a comparator were not similarly situated because the plaintiff had more experience than the comparator.  The court explained that the plaintiff and comparator had the same position in the same region, shared the same job requirements, and had the same supervisor who expressed similar criticism of the two employees' job performance. The fact that the comparator had less experience than the plaintiff and was "relatively new to her

job" was insufficient to defeat the plaintiff's showing that she and her comparator were similarly situated. *Id.*

In response, CPS cites a Seventh Circuit case decided after *Coyne*, *Bio* v. *Federal Express Corp.*, 424 F.3d 593 (7th Cir. 2005). In *Bio*, a race discrimination suit, the plaintiff argued that an employee who held the same position as he and reported to the same supervisor was "similarly situated." But the court determined that "the record cannot support the conclusion that they were directly comparable. As the district court pointed out, there was a considerable gap in experience between the two men." *Id.* at 597. It elaborated that the plaintiff had been in his position for more than four years when he was disciplined based on a performance complaint but the other employee "was a novice" and had received his performance complaints just eight months into his job "while he was still learning how to perform his duties." *Id.* This precluded a finding that the two were similarly situated. *Id.*

Cooksey had been the principal of Wadsworth for seven years when she was put on the DAP. During Cooksey's leadership, Wadsworth had been on probation for three years because of its poor performance. Asyanbi, on the other hand, had only been a principal six months when his school received 7 out of 42 on the performance review. Cooksey admitted there is not much a principal can do to improve a school's ratings during his first six months on the job. Because

of the disparity in experience, Asyanbi was not similarly situated to Cooksey.[29]  *See Bio*, 424 F.3d at 597.

## ii.     King

Cooksey also argues that King, another younger principal, was treated more favorably than she.  King, the principal of Dumas, was born in 1969.  King is similarly situated to Cooksey in that she held the same position and was also supervised by Coates.  Cooksey does not indicate in her brief, however, how King was treated more favorably.  Cooksey admits in her response to CPS's 56.1 statement that she is contending she was treated differently from King, who was not placed on a DAP or CAP even though her school was also on probation.  King's school, however, received a performance assessment score far above Wadsworth's—a 24 out of 42, compared to Wadsworth's 9 out of 42.  Neither does Cooksey demonstrate that a standard existed that should have resulted in a DAP or CAP for King.  Without any evidence that King should have been on a DAP or CAP, a significantly better score is a "differentiating or mitigating circumstance[ ]" that would distinguish Coates' treatment of King from her treatment of Cooksey.  *Coleman*, 667 F.3d at 846.  King is thus not a similarly situated employee.[30]

---

[29]  To the extent that Cooksey points to Asyanbi as a comparator for summer school, the court notes that he was also required to supervise summer school two years in a row—albeit at his own school. The fact that he was not required to have a safety plan for his summer school is understandable, as he hosted summer school in his own school and thus was familiar with safety precautions.  Moreover, the requirement that Cooksey draft a safety plan cannot be considered an adverse employment action. Cooksey's argument that Coates asked a security guard to report on the happenings at Doolittle but did not do so at Asyanbi's school is also irrelevant, as Coates did not actually ask the security guard to report *about Cooksey*.  In any case, because Asyanbi was not similarly situated, these arguments are moot.

[30]  King, like Asyanbi, was required to host summer school two years in a row but at her own school.  And like Asyanbi, the fact that she was not required to draft a safety plan for her summer school is a non-starter because drafting a safety plan is not an adverse employment action, nor was not asking a security guard at King's school to report to Coates.  In any case, King was not similarly situated to Cooksey because her school earned a comparatively higher performance assessment score.

### iii. Conlan

Cooksey points to Conlan as a "younger principal[ ]" who was treated more favorably than she but gives no explanation of the disparate treatment. (Dkt. 47 at 10.) Again, the record does not reveal Conlan's age. Conlan was also the principal of a middle school whereas Cooksey was principal of an elementary school. Cooksey makes no attempt to show how, despite these facts, she and Conlan were similarly situated.

### iv. Spiller

Finally, Cooksey identifies Sonia Spiller, a young principal who was struggling and whom Jackson-Berry believed should have been placed on a DAP.[31] Cooksey notes that Jackson-Berry testified that Coates asked Jackson-Berry to help Spiller but Coates did not provide such help to Cooksey. Cooksey does not, however, identify Spiller's age or any other facts about her. Moreover, Jackson-Berry testified that Coates approached her about helping Spiller because Jackson-Berry and Spiller had a close relationship. With no other information about Spiller, the court cannot conclude she was similarly situated to Cooksey.

In short, none of the comparators that Cooksey proffers are valid comparators, and she is therefore unable to demonstrate that others outside her protected age group were treated more favorably than she. As such, she fails to prove an essential element of her claim.

---

[31] As discussed in footnote 23 above, the record does not reveal whether Spiller received a performance assessment score on the 42-point scale.

### 2. Whether CPS Had A Legitimate, Nondiscriminatory Reason for Disciplining Cooksey

Even if Cooksey satisfied her *prima facie* case, CPS has asserted a legitimate, nondiscriminatory reason for all actions Coates took with regards to Cooksey. *Fleishman*, 698 F.3d at 609. Wadsworth's low performance assessment score, the fact that it had been on suspension for three years, and the poor reading and science scores of its students were sufficient reasons for Coates and CPS to give Cooksey a negative performance review and place her on the DAP and CAP. CPS also explained that it suspended Cooksey because of safety issues at Wadsworth. These reasons on their face are nondiscriminatory under the ADEA, requiring Cooksey to demonstrate pretext.

### 3. Whether Cooksey Demonstrated that CPS Acted with Pretext

To show pretext, Cooksey must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez* v. *Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quoting *E.E.O.C.* v. *Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006)). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (brackets omitted)). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *See Duncan*, 518 F.3d at 492.

At bottom, CPS contends that Cooksey's inability to meet its performance expectations was the nondiscriminatory reason justifying her treatment. In cases like these, the pretextual

inquiry blends together with whether Cooksey was meeting CPS's legitimate employment expectations. *See Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 477-78 (7th Cir. 2010) ("In some cases, though, the issue of satisfactory performance and the question of pretext overlap. When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis.").

Cooksey has no evidence demonstrating that a similarly situated younger principal was treated more favorably than she. Nor does she have evidence that an older principal whose performance was satisfactory was disciplined like Cooksey. Thus, there is simply no evidence from which to infer under the indirect method of proof that Coates was motivated by Cooksey's age rather than her performance, and that Coates' acts were pretextual.

Even so, Cooksey argues that placing her on the DAP and CAP (which, again, were not adverse employment actions) were pretextual and that Coates did not take this action based on Wadsworth's scores. As discussed in footnote 19, *supra*, there is some ambiguity in Coates' testimony about which scores (if any) she relied on in placing Cooksey on the DAP and CAP. But Coates clearly stated at her deposition that she was concerned that data showed Wadsworth was faring poorly but not taking "the initiative to investigate ways of improving things or follow the suggestions that were made by other principals or myself in order to improve the school." (Dkt. 45, Ex. 4 at 127:7-17.) Whether Coates was correct in her belief that Wadsworth was not improving or Cooksey was not taking initiative to help it improve is not outcome determinative. *See, e.g., Green* v. *Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999) (even if a company "may well have been mistaken in its beliefs about its employee and perhaps should

have conducted a more thorough investigation," the employee will not prevail in demonstrating pretext unless he is able to demonstrate that his employer did not in good faith believe the reasons it provided for discharging him). The fact remains that Coates believed Cooksey was a poor principal and Coates took actions to rectify the problem.

Cooksey's other arguments on CPS's alleged pretext also fail. Although she is correct that she should have been issued a "warning resolution" with the CAP,[32] this procedural error does not indicate pretext on CPS's part since it was a recommendation rather than a mandate. *See Fortier* v. *Ameritech Mobile Comm'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (defendant's failure to issue a counseling statement before terminating defendant did not "provide[ ] evidence of pretext" where issuance of counseling statement was discretionary).[33]

Cooksey's "nitpicky" argument fails as well. She asserts that Coates' coming to meet with Cooksey when Coates allegedly knew that Cooksey would not be there, "claiming" she waited longer than she did for someone to answer the door to the school a different time she was supposed to meet with Cooksey, requiring Cooksey to have a safety plan for summer school, and not holding Cooksey to the same standards as "younger" principals" all illustrate this "nitpicky" conduct. But the case she cites, *Mullin* v. *Temco Machinery, Inc.*, 732 F.3d 772, 778-80 (7th Cir.

---

[32] The CPS Policy Manual provides that when a CAP is issued to a contract principal, "the CEO [of CPS] shall also recommend that the Board [of Education] adopt a Warning Resolution to be issued to the contract principal immediately, which warning resolution incorporates by reference the terms of the CAP." (Dkt. 33, Ex. 9 at 5.)

[33] The cases on which Cooksey relies do not convince the court otherwise because the failure to follow procedure in those cases was detrimental to the plaintiff. *See Rudin* v. *Lincoln Land Comm. College*, 420 F.3d 712, 723 (7th Cir. 2005) (employer failed to follow internal hiring procedures and then failed to hire plaintiff); *Giacoletto* v. *Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (employer failed to follow procedure of helping plaintiff to improve performance prior to firing plaintiff). Here, however, Cooksey has not alleged that receiving a warning resolution with the CAP would have helped her in any way, as the CAP already made clear the deficiencies in Cooksey's performance.

38

2013), is distinguishable. The plaintiff there was fired and replaced by two much younger employees. The employer also terminated another older employee around the time it terminated the plaintiff. Moreover, one of the replacement employee's "youth was explicitly part of [the employer's] 'thought process' in hiring him." *Id.* at 778. There were also disputed facts that went to whether the employer had actual reasons to fire the plaintiff, such as whether the plaintiff failed to go to work one day.

Cooksey has presented no such factual issues here. Moreover, CPS presents evidence that Cooksey was not meeting its legitimate expectations. Coates testified that she took the actions she did regarding Cooksey—only one of which actually constituted an adverse employment action—because of Cooksey's actual, documented failings as principal of Wadsworth, which Cooksey does not dispute. Turner's testimony about what Wadsworth was doing and his opinions on Cooksey's performance do not weigh heavily to the contrary and are insufficient to raise a genuine issue of material fact. *See, e.g., Williams* v. *Williams Elecs., Inc.*, 856 F.2d 920, 924 (7th Cir. 1988) (testimony by plaintiff's former supervisor regarding plaintiff's abilities that did not explicitly weigh plaintiff's abilities against other employees' did "not create a basis upon which it can be concluded that [defendant] did not genuinely and honestly weigh performance-based considerations in" deciding to terminate plaintiff).

For all of these reasons, Cooksey has not shown that she was meeting CPS's legitimate expectations or that Coates acted with pretext. Cooksey's attempt to proceed under the indirect method fails.

**B.      Direct Method**

Cooksey also asserts that she has made out a claim using the direct method. To survive summary judgment under the direct method, Cooksey must present direct or circumstantial evidence that would allow a jury to infer that any adverse employment action taken against her was motivated by discriminatory intent. *See Dickerson* v. *Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). The required causal connection may be shown through either direct evidence (*i.e.*, a smoking gun admission by Coates that she took any negative action against Cooksey because of her age) or through a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Silverman* v. *Bd. of Educ. of the City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (citations omitted). "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the [adverse action]." *Pagel* v. *TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "Circumstantial evidence under the direct method . . . must allow a jury to infer more than pretext; it must itself show that the decision maker acted because of the prohibited animus." *Venturelli* v. *ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Cooksey admittedly has no direct evidence but asserts that she has "ample circumstantial evidence in the record regarding the suspicious timing of Coates's statements and behavior toward other older employees from which a reasonable juror could infer discrimination." (Dkt. 47 at 7.) Cooksey first states that when Coates began working for CPS, she received from her predecessor a list of principals, including Cooksey and "some other older principals," to be disciplined. (Dkt. 4 at 7.) She provides absolutely no support for this statement. She also does

not explain why these principals were on a disciplinary list, whether younger principals were on this list, or if the principals on the alleged list merited punishment. Cooksey next argues that Coates gave four older principals (Cooksey, Lennix, Rogers, and Bordelon) "poor performance ratings and/or influenced their removal from their respective schools." (*Id.* at 8.) She points to Lennix's comment during her deposition that Coates asked once during a Christmas breakfast of principals "who are the oldest principals in the Area." (Dkt. 46, Ex. 3 at 25:13-20.) But Lennix also testified Coates "already had the answer" and she asked the question "under the auspices of a game." (*Id.* at 26:22-27:4.) Other than this question, there is no admissible evidence of Coates' making any age-related comment.[34]

Cooksey also cites the fact that Coates replaced Rogers with the younger Asyanbi. But that fact alone, especially where there is no indication in the record of the age of either Rogers or Asyanbi, is insufficient to create an issue of material fact. *See La Montagne* v. *Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1413 (7th Cir. 1984) ("Because younger people often succeed to the jobs of older people for perfectly legitimate reasons, the mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination."). Similarly, Coates asked Burnett (who is 13 years younger than Cooksey) if Burnett would be interested in becoming a principal and noted there could potentially be an opening at Wadsworth. But there is no evidence this was related to Cooksey's age and it is not indicative of Coates' alleged "plan to get the older principals 'out of there.'" (Dkt. 47 at 8.) Even though Coates allegedly asked Burnett this question "at or around the time that Cooksey

---

[34] As noted, while discriminatory comments can come in as admissions of party opponents, there is no hearsay exception to allow in the second layer of hearsay. Accordingly, Lennix's testimony that Rogers told her Coates made discriminatory comments is inadmissible. *See Baron*, 195 F.3d at 339.

was placed on the DAP and CAP," this still does not evidence a desire to discriminate against Cooksey because of her age. (*Id.*) Moreover, Cooksey's "timing" arguments are inadequately explained. (*Id.* at 12.)

Cooksey also argues that Coates' asserted reasons for putting Cooksey on the three-day suspension were discriminatory and pretextual because CPS's "own report shows that the numbers on the school doors were clearly posted per a previous audit." (Dkt. 47 at 11.) Although Cooksey is correct about that aspect of the report, it also discusses the confusion among Wadsworth staff about the safety policy at the school. Cooksey further argues that Coates was incorrect in finding that Cooksey took too long—multiple days—to obtain contact information for the family of a Wadsworth student because Cooksey was diligently searching for the information. But it is insufficient for Cooksey to show simply that CPS's determination was wrong. The Seventh Circuit "has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions." *Green*, 197 F.3d at 899; *see also Biolchini* v. *Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) ("[T]his court has noted that even where a plaintiff in a discrimination case alleges that the company's investigation was imprudent, ill-informed and inaccurate, summary judgment is appropriate unless the employee could point to facts suggesting that the company investigated him differently because he was an older employee.") (internal quotation, citation, and brackets omitted). Thus, even if Coates was mistaken in her belief that the doors at Wadsworth were not well-numbered or that Cooksey took too long to give Coates contact

information for the Wadsworth family, that is insufficient to create a genuine issue of material fact to defeat CPS's motion for summary judgment.

Additionally, as Coates explained, she placed Cooksey on the three-day suspension at the suggestion of a CPS risk manager whom Cooksey admits did not discriminate against her (or even know her age). Cooksey argues that Coates cannot blame a different CPS employee for the disciplinary proceedings, citing the "cat's paw" theory. As applied in the Seventh Circuit, "'cat's paw' liability may be imposed on an employer 'where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.'" *Smith* v. *Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (quoting *Alexander* v. *Wisc. Dep't of Health & Fam. Servs.*, 263 F.3d 673, 684 (7th Cir. 2001)). The cat's paw theory will also "support holding the *employer* vicariously liable under both [42 U.S.C.] § 1981 and 42 U.S.C. § 1983[.]" *Id.* (emphasis in original). Cooksey does not explain how the theory is applicable to this case. There is no allegation that the risk manager acted at Coates' behest. In fact, it was *Coates* who suspended Cooksey for the security breaches. Cooksey admits the security manger did not know Cooksey's age or discriminate against her.

Finally, Andrews' testimony does not create a genuine issue of material fact regarding discrimination. Andrews testified that Coates told her to draft Cooksey's CAP by pulling other negative material from other principals' CAPs. Andrews' admission that Coates seemed to genuinely believe Cooksey deserved to be on a CAP and that Andrews never heard her mention Cooksey's age, however, belies Cooksey's argument that Coates' true reason for treating Cooksey the way she did was "based on a discriminatory intent." *Perez*, 488 F.3d at 777. Moreover, Andrews' testimony that she did not see a time blocked out in Coates' calendar when

Coates would visit Wadsworth to see Cooksey's progress is blunted by her admission that it is entirely possible Coates stopped by Wadsworth without telling Andrews or putting it in her calendar.

Cooksey is thus left with not much more than deposition testimony that Coates did things like "roll[ ] her eyes" at older principals (Pl. L.R. 56.1 Resp. ¶¶ 20, 62), and subjective opinion testimony that Coates treated older principals worse than she treated younger principals (*id*. at ¶ 77). This is insufficient to create a "convincing mosaic" of circumstantial evidence. *See, e.g., McMillian* v. *Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989) ("[S]ubjective beliefs of the plaintiff, however, are insufficient to create a genuine issue of material fact."); *Chiaramonte* v. *Fashion Bed Grp.*, 129 F.3d 391, 401 (7th Cir. 1997) (same); *Anderson* v. *Nat'l R.R. Passenger Corp.*, No. 03 C 7589, 2006 WL 931699, at *7 (N.D. Ill. Apr. 6, 2006) (same); *Gettis* v. *Ill. Dep't of Transp.*, No. 3:09-cv-639, 2011 WL 1232817, at *5 (S.D. Ill. Mar. 30, 2011) ("[T]he court finds that the opinion of other employees as to the motivation of Plaintiff's supervisors in and of itself is insufficient to directly show or create a 'convincing mosaic' of racial discrimination."). Cooksey has failed to present any genuine issues of material fact on Count I of her complaint. CPS's motion for summary judgment on that Count is granted.

## III.    42 U.S.C. § 1981 Retaliation

Cooksey also brings a claim for retaliation under section 1981. Section 1981 prohibits employers from discriminating against employees on the basis of race or national origin, not age. *See Patton* v. *Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir. 2002); *Lubavitch-Chabad of Ill., Inc.* v. *Northwestern Univ.*, No. 12 C 7571, -- F. Supp. 2d ----, 2013 WL 6730297, at *6 (N.D. Ill. Dec. 19, 2013). Cooksey admits that she has never alleged race

retaliation during the two years that this suit has been pending but insists she can amend her pleadings at this late stage in the proceedings to add this claim and that the evidence supports it.

It is too late for Cooksey to pursue this claim. "[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" *Anderson* v. *Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson* v. *O'Neil*, 308 F.3d 808, 817 (7th Cir. 2002)). Count II of Cooksey's complaint is entitled, "Discrimination Based on Retaliation in Violation of the ADEA 42 U.S.C. § 1981, ADEA, and 42 U.S.C. § 1983." (Compl. at 4.) It "repeats and realleges the allegations contained in paragraphs 1 through 23" of the complaint, which relate to age discrimination, not race discrimination. (*Id.* ¶ 24.) This reference to discrimination, in the context of an age discrimination claim, is insufficient to put CPS on notice of a claim for race discrimination. *Anderson*, 699 F.3d at 998. CPS's motion for summary judgment is granted.

## IV.    42 U.S.C. § 1983 Retaliation

Finally, Count II of Cooksey's complaint alleges retaliation in violation of section 1983. Because "the doctrine of respondeat superior is unavailable under § 1983," Cooksey must present evidence "that the Board itself violated her civil rights." *Darchak* v. *City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). CPS can be held liable for retaliation under section 1983 through "(1) an express municipal policy; (2) a widespread practice constituting custom or usage; or (3) a constitutional injury caused or ratified by a person with final policymaking authority." *Id.* (quoting *Simmons* v. *Chicago Bd. Of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002)).

Cooksey's complaint does not illuminate the details she feels support this claim. Although Cooksey's brief is less than clear, she appears to allege that CPS had a widespread practice constituting its custom of discriminating against principals based on their age, and that it

exercised this practice by ratifying Coates' decision to subject Cooksey to "undue security and disciplinary action." (Dkt. 47 at 19.) This claim fails. Cooksey presents no evidence that supports her allegation that CPS had a custom of discriminating based on age, as discussed throughout this opinion. Further, she does not demonstrate that she suffered any constitutional injury. And to the extent that she is alleging that Coates' actions—which CPS ratified—somehow forced her to retire, this is a non-starter: she did not retire until well after Coates left CPS.

Finally, if Cooksey is actually alleging that she suffered a constitutional injury that was caused by a person with final policymaking authority, *i.e.* Coates, this claim fails because she has not alleged that Coates has final policymaking authority. "[P]olicymaking is broader than decision making," and the fact that Coates made some decisions does not demonstrate her ability to make policy for CPS. *Darchak*, 580 F.3d at 630. CPS's motion for summary judgment on Cooksey's section 1983 retaliation claim is granted.

## CONCLUSION AND ORDER

CPS's motion for summary judgment is granted with prejudice. Upon reviewing the briefs and exhibits submitted in relation to the pending motion for summary judgment, the court has observed that there are a number of personal identifiers (*i.e.*, social security numbers, birth dates) that are listed in plaintiff's filings, in particular in the depositions plaintiff submitted. Plaintiff shall provide the court with a list of the these filings that contain personal identifiers,

and then file redacted versions of these exhibits deleting this personal information by February 27, 2014.  This case is terminated.

Dated: February 19, 2014

Enter: _____
JOAN HUMPHREY LEFKOW
United States District Judge

.